USDC SCAN INDEX SHEET

CGL 4/13/05 11:22

3:03-CV-00527 SNOW V. SAN DIEGO CITY OF

*35*

*TRLBR.*

ORIGINAL

FILED
'05 APR 12 PM 4:12
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

**MICHAEL A. CONGER, ESQUIRE (State Bar No. 147882)**
**LAW OFFICES OF MICHAEL A. CONGER**
16236 San Dieguito Road, Suite 4-14
**Mailing:** P.O. Box 9374
Rancho Santa Fe, California 92067
Telephone: (858) 759-0200
Facsimile: (858) 759-1906

Attorneys for Plaintiffs ERIN SNOW, LISA DARLING, on behalf of themselves and all others similarly situated

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIN SNOW and LISA DARLING, individuals, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN DIEGO; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO: 03 CV 0527 LAB(BLM)<br><br>[Complaint Filed: 3/17/03]<br><br>**PLAINTIFFS' TRIAL BRIEF**<br><br>Trial Date: April 19, 2005<br>Time: 9:00 a.m.<br>Judge: Hon. Larry A. Burns |

35

# TOPICAL INDEX

Page

I. FACTUAL BACKGROUND AND NATURE OF THE CASE ..... 1

A. The Higher Paying Supervisorial Positions in the City of San Diego's Lifeguard Service All Belong to Men ..... 1

B. Plaintiff Erin Snow ..... 3

C. Plaintiff Lisa Darling ..... 4

D. The City's Lifeguard Promotional Policies Have Adversely Impacted Women Who Rarely Receive "Outstanding" Annual Employee Performance Ratings, a Key to Obtaining a Promotion ..... 4

1. All employees have their performance rated annually ..... 4

2. Ratings weigh heavily in the promotional process and an outstanding rating dramatically improves an employee's chance of promotion ..... 5

3. Females rarely, if ever, receive the highest rating and men frequently do ..... 6

II. LIABILITY ..... 6

A. The Existence of the Employer's Practice or Policy ..... 7

B. The Policy Has Significant Adverse Impacts on Persons of a Protected Class ..... 7

C. The Impact of the Policy Is on Terms, Conditions or Privileges of Employment of the Protected Class ..... 8

D. The Employee Population in General Is Not Affected to the Same Degree ..... 9

E. The City Cannot Demonstrate a Business Necessity to Constantly Rate Men Higher Then Women in the Subjective EPR Process ..... 9

III. DAMAGES ..... 10

IV. INJUNCTIVE RELIEF ..... 11

V. CONCLUSION ..... 12

# TABLE OF AUTHORITIES

*Cases* Page

Albermarle Paper Co. v. Moody
(1975) 422 U.S. 405 . . . . . . . . . . 10, 12, 13

Cassino v. Reichhold Chemicals, Inc.
(9th Cir. 1987) 817 F.2d 1338 . . . . . . . . . . 11

Castaneda v. Partida
(1977) 430 U.S. 482 . . . . . . . . . . 8

Cloud v. Casey
(1999) 26 Cal.App.4th 895 . . . . . . . . . . 10

Commodore Home Systems, Inc. v. Superior Court (Brown)
(1982) 32 Cal.3d 211 . . . . . . . . . . 11

Donald Schriver, Inc. v. Fair Employment & Housing Comm'n
(1986) 220 Cal.App.3d 396 . . . . . . . . . . 12

EEOC v. Hacienda Hotel
(9th Cir. 1989) 881 F.2d 1504 . . . . . . . . . . 10

Garcia v. Spun Steak Co.
(9th Cir. 1993) 998 F.2d 1480 . . . . . . . . . . 7

Griggs v. Duke Power Co. (1971)
401 U.S. 424 . . . . . . . . . . 6, 9

Hazelwood School Dist. v. United States
(1977) 433 U.S. 299 . . . . . . . . . . 8

Hemmings v. Tidyman's Inc.
(9th Cir. 2002) 285 F.3d 1174 . . . . . . . . . . 8

International Brotherhood of Teamsters v. United States
(1977) 431 U.S. 324 . . . . . . . . . . 6

Johnson v. Civil Service Comm'n
(1984) 153 Cal.App.3d 585 . . . . . . . . . . 12

League of United Latin American Citizens (LULAC), Monterey Chapter 2055 v. City of Salinas Fire Dept.
(9th Cir. 1991) 654 F.2d 557 . . . . . . . . . . 12

Pollard v. E.I. du Pont de Nemours & Co.
(2001) 532 U.S. 843 . . . . . . . . . . 10, 11

Satterwhite v. Smith
(9th Cir. 1984) 744 F.2d 1380 . . . . . . . . . . 10

Segar v. Smith
(DC Cir. 1984) 738 F.2d 1249 . . . . . . . . . . 7, 9

Stout v. Potter
(9th Cir. 2002) 276 F.3d 1118 . . . . . . . . . . 7

Trujillo v. North Co. Transit Dist.
(1998) 63 Cal.App.4th 280 . . . . . . . . . . 9

Wards Cove Packing Co., Inv. v. Atonio
(1989) 490 U.S. 642 . . . . . . . . . . 6

Watson v. Fort Worth Bank & Trust
(1988) 487 U.S. 977 . . . . . . . . . . 8, 9

*Rules*

Federal Rules of Civil Procedure
Rule 30(b)(6) . . . . . . . . . . 5

*Other Authorities*

California Government Code
§ 12940(a) . . . . . . . . . . 1
§ 12940(k) . . . . . . . . . . 9

§ 12965 . . . . . . . . . . 10

§ 12965(c) . . . . . . . . . . 12

§ 12970(a) . . . . . . . . . . 12

42 U.S.C.

§ 1981a . . . . . . . . . . 11

§ 1981a(b)(3) . . . . . . . . . . 11

§ 2002e-2 . . . . . . . . . . 1

§ 2002e-5(g) . . . . . . . . . . 10, 11

29 C.F.R. §§ 1607.1-1607.18 . . . . . . . . . . 8

Plaintiffs Erin Snow and Lisa Darling respectfully submit this trial brief in their disparate impact gender discrimination lawsuit against the City of San Diego, which has no women among the top 26 positions among its lifeguard employees, and only six women among its 93 permanent lifeguard employees. (Exhibit 1 ["Exh. 1"]; Revised Pretrial Order, Admitted Facts, III(C), (E)-(F).) In this case, the plaintiffs challenge the City's lifeguard promotional policies and practices which have resulted in effectively shutting women out from employment past part-time summertime positions (Lifeguard I) and the lowest (and least paying) entry-level position (Lifeguard II).

Specifically, the plaintiffs challenge the City's longstanding practice of refusing to give women the highest rating of "outstanding" in employees' annual performance reviews. Incredibly, although complaints of lack of diversity in the City's lifeguard workforce were acknowledged by City personnel as far back as 1997, in the five-year period from January, 1999 to December, 2003, male Lifeguard IIs and IIIs received 76 outstanding ratings, while *female Lifeguard IIs did not receive a single outstanding rating*. Over that same period, male Lifeguard Is received 82 outstanding ratings and female Lifeguard Is received only 8.

Given the importance of employee performance ratings in the promotional process, the City's practice of refusing to rate women fairly has discriminated against women, and the plaintiffs are entitled to damages and injunctive relief pursuant to both 42 U.S.C. section 2000e-2 (Title VII) and California Government Code section 12940(a).

## I.
## FACTUAL BACKGROUND AND NATURE OF THE CASE

### A. The Higher Paying Supervisorial Positions in the City of San Diego's Lifeguard Service All Belong to Men.

In 1918, prompted by the drowning of 13 people on a single day in Ocean Beach, the City of San Diego began employing lifeguards to enhance public safety to users of San Diego's coastline and ocean waterways. (Revised Pretrial Order, Admitted Facts, III(A).) Women were not hired at all by the City's Lifeguard Service until the 1970s. (Revised Pretrial Order, Admitted Facts, III(B).)

The San Diego City Lifeguard Service management includes one chief, five lieutenants, 13 sergeants, 68 permanent lifeguards (the positions are either "Lifeguards II" or "Lifeguard III"[1]), and approximately 200 seasonal temporary lifeguards (called "Lifeguard I"). (Revised Pretrial Order, Admitted Facts, III(C).[2]) The compensation paid to employees increases with each rank, and there is a substantial increase in compensation between the temporary or seasonal Lifeguard Is and the permanently employed Lifeguard IIs, who receive full year-round salary and benefits, including full vesting in the City's defined benefit pension plan. Employees of the City's Lifeguard Service can also earn extra pay (of approximately 10%) if they are assigned to the cliff, river, or dive rescue teams. (Revised Pretrial Order, Admitted Facts, III(D).) Only one female is so assigned compared to 35 males. (Revised Pretrial Order, Admitted Facts, III(G).) Approximately 15 lifeguards at higher ranks also receive substantial overtime payments, sometimes exceeding $30,000 in extra compensation, and overtime opportunities are restricted to males (with perhaps one exception).

Lifeguard Is perform the bulk of the water rescues and any other physical labor. Lifeguard IIs and employees of higher rank have ever increasing supervisorial responsibilities, with sergeants, lieutenants and the chief rarely performing water rescues or other physical tasks.

Promotions within the City's Lifeguard Service are from within the department. (Wurts Depo., June 9, 2004, at p. 77:21-23 ["It's our current practice and has been for many years now that it's a promotional process from within the department"].) Thus, Lifeguard IIs are hired from the pool of Lifeguard Is. (Wurts Depo., June 9, 2004, p. 77:15-25.) Lifeguard IIIs (Wurts Depo., p. 78:19-23) and sergeants (Wurts Depo., June 9, 2004, pp. 83:11-13, 84:6-7) are hired from the pool of Lifeguard IIs. Lieutenants are hired from the City's existing group of lifeguard

---

[1] Lifeguard IIIs are "Lifeguard IIs with some additional certification." (Deposition of Lieutenant Richard Wurts ["Wurts Depo."], June 9, 2004, pp. 78:1-18, 79:8-10.) An employee does not have to become a Lifeguard III to be promoted to Sergeant. (Wurts Depo., June 17, 2004, p. 152:1-3.)

[2] The number of permanent employees (Lifeguard II and higher) fluctuates depending on conflicting data provided by the City (cf. Exh.1 with Admitted Fact III(C)). One fact, however never changes—the City has only six females among its entire permanent employee workforce, and all of those women enjoy only the lowest permanent rank of Lifeguard II.

sergeants. (Wurts Depo., June 9, 2004, p. 84:8-10.)

Pay also increases with each step to a higher rank. The information from the following table is taken from data provided by the City (Exh. 1), as of calendar year end 2003:

| **Position** | **Number of employees** | **Percentage female (number of females)** | **Average Pay (2003)** |
|---|---|---|---|
| Chief | 1 | 0% (0 females) | $114,142.53 |
| Lieutenant | 5 | 0% (0 females) | $82,491.22 |
| Sergeant (not including seasonal sergeants) | 13 | 0% (0 females) | $78,615.75 |
| Lifeguard III | 7 | 0% (0 females) | $69.080.08 |
| Lifeguard II (lowest full-time position) | 61 | 9.84% (6 females) | $55,917.08 |
| Lifeguard I (entry level/summertime position) | 187 | 23.53% (44 females) | $10,555.93 |

Importantly, as "part-time" employees, Lifeguard Is do not receive pension, health or other valuable employment benefits. (Wurts Depo., p. 29:5-13.)

Thus, there exists a severe drop off in the percentage of females promoting to Lifeguard II from the pool of Lifeguard Is (23.52% to 9.84%) and a complete elimination of females (0%) in supervisorial positions thereon up the chain of command.

**B. Plaintiff Erin Snow**

Plaintiff Erin Snow, a graduate of San Diego State University (a member of the swim team and communication major) became a Lifeguard I in 1999. Although always highly rated, she was unable to obtain the necessary certifications and the highest rating needed to promote to Lifeguard II. Frustrated by the continual lack of promotional opportunities, and after several instances of sexual harassment and retaliation, she resigned her temporary employment on November 12, 2003.

///

///

**C. Plaintiff Lisa Darling**

Plaintiff Lisa Darling, biology major at the University of California San Diego (one class shy of graduation) has been employed as a City lifeguard since 1992. In 1998, she became one of only four female Lifeguard IIs, but like the other female Lifeguard IIs, has never received an outstanding performance rating, a key to promotion.

**D. The City's Lifeguard Promotional Policies Have Adversely Impacted Women Who Rarely Receive "Outstanding" Annual Employee Performance Ratings, a Key to Obtaining a Promotion.**

**1. All employees have their performance rated annually.**

Each year, all employees, including Lifeguard Is, have their performance rated. These ratings are commonly referred to as an "EPR," for "employee performance rating." The highest rating is "outstanding." The intermediate rating is "above standard." The lowest rating is "satisfactory."[3]

To obtain these ratings, Lifeguards Is and Lifeguard IIs are rated on a set of "standards," which measure an employee's yearly performance on various criteria, such as "reports to work as scheduled," "operates vehicle in a safe and courteous manner," and "submits all forms accurately." (Exhs. 2-10.) Typically, employees are rated on two or three pages of standards, with as many as 17 standards per page. On each individual "standard," employees are rated with a minus (for weak), a check (average), a plus (strong), or an "N.O." (not observed). However, no objective policy or guidelines exist regarding the level of performance which merits a "plus," "check" or "minus." (Wurts Depo., Dec. 3, 2004, pp. 19:20-25, 23:1-8.)

A rating (outstanding, above standard, or satisfactory) is then given on the bottom of each individual page of standards. Again, no objective method exists regarding how to rate an employee based on the number of "pluses," "checks," or "minuses" received. "[A] person could . . . get all pluses and still get an above standard [while another employee] could get all checks and [receive] an outstanding." (Wurts Depo., Dec. 3, 2004, p.24:6-15.) Finally, an overall rating is provided based on the standards rated, and employees are given an overall rating

---

[3] Technically, there are also ratings for "below standard," and "unsatisfactory" (Exh. 2-10) but these ratings are not used. (See Exh. 22, listing of all Lifeguard I, II, and III ratings from period 1999 through 2003).

of outstanding, above standard, or satisfactory.

The City concedes that there is nothing in these annual evaluations which should favor men over women. (Hewitt Depo., p. 48:9-16; Wurts Depo., Dec. 3, 2004, pp. 17:4-7, 17:22-18:11 [no reason man would have any advantage over a woman in employee performance review]; Bender Depo., pp. 27:12-28:2.)

**2. Ratings weigh heavily in the promotional process and an outstanding rating dramatically improves an employee's chance of promotion.**

Quite understandably, the EPRs weigh heavily in the promotional process, as they have for at least a decade. (Harris Depo., p. 15:3-11 ["common knowledge amongst Lifeguards that if you did a good job and received a higher EPR, in other words, outstanding, that you stood a better chance of being [promoted]"; Hewitt Depo., pp. 47: 24-48:1 ["the higher the ranking . . . on their performance rating is a positive thing"]; Wurts Depo., Dec. 3, 2004, pp. 13:15-14:10 ["I would say that we more often than not are interested in hiring the person with the best performance"].) Both plaintiffs, and other employees, are discouraged from even seeking a promotion without having received an "outstanding" EPR. During the actual promotional process, Lieutenant Wurts prepares a list of the candidates and their recent EPRs, with apparent emphasis on the most recent EPR.[4] (Exh. 16.) Historically from 1999 to 2004, Lifeguard Is and Lifeguard IIs were in fact much more likely to be promoted if that employee had received an outstanding rating in the year prior to the promotion. (Exh. 15 [24 of 31 Lifeguard Is and 8 of 12 Lifeguard IIs promoted during period had outstanding rating in the year prior to the promotion].)

---

[4] Lieutenant Wurts, who was designated by the City as its Rule 30(b)(6) witness on the topic of the City's lifeguard hiring and promotion policies and practices since March 17, 2000, testified:

> "[f]or Lifeguard II, in the promotional process, once they're done with the interview, one advantage that we have over Lifeguard II from Lifeguard I is I have a work history for Lifeguard I applying for Lifeguard II. So now the next part of the process is an evaluation of their personnel jacket . . . I pull their personnel jackets and I go through them. I highlight what their EPR . . . rankings were [and] I list those . . . call it a matrix, where it has the names and an evaluation of their employee performance, overall EPR rankings." (Wurts Depo., June 9, 2004, pp. 92:10-94:21.)

**3. Females rarely, if ever, receive the highest rating and men frequently do.**

Despite the importance of receiving an outstanding EPR in the promotional process, the City has a practice of refusing to give this rating to females. In the five-year period from 1999 to 2003, male Lifeguard IIs and IIIs (the pool from which Sergeants are chosen) were given outstanding ratings 76 times, while female Lifeguard IIs were *never given that rating*. (Exh. 22.) During the same period, male Lifeguard Is received an outstanding rating 82 times, while female Lifeguard Is received that highest rating only eight times. (Exh. 22.)

Theses disparities are more alarming because in the middle to late 1990's, there were complaints and investigations regarding the lack of gender diversity in the lifeguard service. While acknowledging an affirmative obligation to provide a workplace free of discrimination, both Chief Hewitt and Lieutenant Wurts, the Lifeguard Service EEO officer, claim to have been unaware that females had never been given the highest ratings on their EPRs during the period from 1999 to 2003, well after the complaints of years earlier had been. (Hewitt Depo., pp. 48:3-6, 51:13-17, 59:9-14; Wurts Depo., Dec. 3, 2004, pp. 14:14-17, 16:9-12.)

## II. LIABILITY

Disparate impact gender discrimination in violation of Title VII, i.e., regardless of motive, a facially neutral employer practice or policy, bearing no relationship to job requirements, in fact has a disproportionate adverse impact on members of a protected class. (International Brotherhood of Teamsters v. United States (1977) 431 U.S. 324, 335; Griggs v. Duke Power Co. (1971) 401 U.S. 424, 431.) Unlike disparate treatment, the disparate impact theory does not require proof of intent to discriminate. (International Brotherhood of Teamsters, 431 U.S. at p. 335; and see Wards Cove Packing Co., Inv. v. Atonio (1989) 490 U.S. 642, 646.)

In order to meet their prima facie burden in a disparate impact case, plaintiffs must demonstrate: (1) the existence of the employer's practice or policy, (2) that the policy has significant adverse impacts on persons of a protected class, (3) that the impact of the policy is on

terms, conditions or privileges of employment of the protected class, and (4) that the employee population in general is not affected to the same degree. (Garcia v. Spun Steak Co. (9th Cir. 1993) 998 F.2d 1480,1486.)

Once the plaintiff has met this burden, the employer bears the burden of persuasion as to the business necessity of the employment practice in question. (Segar v. Smith (DC Cir. 1984) 738 F.2d 1249, 1267.) There is no valid reason to consistently rate women lower than men. There can be no valid business necessity of adhering to employment policies and practices that have consistently selected men for promotion at a vastly higher rate than women for the coveted permanent and higher compensation supervisorial levels enjoyed predominantly by men for almost a century.

**A. The Existence of the Employer's Practice or Policy**

As discussed above, the City concedes that it has a promotional policy heavily weighted by employee performance reviews. In truth, the City has in practice refused to provide women lifeguards the highest EPR ratings, and those ratings have a very high correlation to those receiving promotions.

**B. The Policy Has Significant Adverse Impacts on Persons of a Protected Class**

The City's practice of refusing to give women the highest EPR rating has had a significant adverse impact on women who have not been able to break through to lowest-level permanent position of Lifeguard II *because no female Lifeguard II has ever received an outstanding* rating while male Lifeguard IIs and IIIs have received that rating 76 times from 1999 to 2003.

In the typical disparate impact case, plaintiffs prove discriminatory impact by showing statistical disparities between the number of protected class members in the qualified group and those in the relevant segment of the workforce: "A prima facie case of disparate impact is usually accomplished by statistical evidence showing that an employment practice selects members of a protected class in proportion smaller than their percentage in the pool of actual applicants." (Stout v. Potter (9th Cir. 2002) 276 F.3d 1118, 1122.) Where an employer fills higher management jobs by internal promotions, the potential applicant pool – and thus the

appropriate comparison pool – is the current employees in lower positions. (Hemmings v. Tidyman's Inc. (9th Cir. 2002) 285 F.3d 1174, 1185-1186.)

The statistical analysis must show a disparity that is "sufficiently substantial that [it] raises[s] such an inference of causation." (Watson v. Fort Worth Bank & Trust (1988) 487 U.S. 977, 995.) Guidelines adopted by the EEOC and California's Department of Fair Employment and Housing Commission suggest a standard 80% rule: i.e., a test or other selection device is generally considered to have an adverse impact if it results in a selection rate for any race, sex, or ethnic group that is less than 80% of the rate of the group with the highest rate. (29 C.F.R. §§ 1607.1-1607.18; Stout, supra, 276 F.3d at 1124 ["the four-fifths rule states that a selection practice is considered to have a disparate impact if it has a 'selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate of the group with the highest rate'"].)

Statistical analysis demonstrates a substantial disparity, as will be addressed by Professor Jim Lackrintz, Ph.D., a statistician and Associate Dean of the Graduate School of Business at San Diego State University. Professor Lackritz has extensive experience in discrimination statistical analysis (typically on the defense side) and will explain that it would be extremely unlikely that the City's lifeguard employment, EPR and promotional makeup could ever occur at random. Professor Lackritz (but not the City's expert) has performed standard deviation analysis,[5] probability analysis, and analyzed the data under the 80 percent, rule and will testify that all tests demonstrate discrimination.

**C. The Impact of the Policy Is on Terms, Conditions or Privileges of Employment of the Protected Class**

The impact of receiving lower ratings has led to fewer women being promoted.

---

[5] The standard deviation is the "measure of the predicted fluctuations from the expected value [and] is defined for the binomial distribution as the square root of the product of the total number in the sample . . . times the probability of selecting [men] times the probability of selecting [women]." (Castaneda v. Partida (1977) 430 U.S. 482, 496, fn. 17.) The challenged employer action is suspect "if the difference between the expected value and the observed number is greater than two or three standard deviations." (Hazelwood School Dist. v. United States (1977) 433 U.S. 299, 308, fn. 14.)

Therefore, the City's practice of rarely awarding an outstanding rating to a female Lifeguard I and never to a female Lifeguard II has taken its toll—the City has no females whatsoever in the top 26 positions in the Lifeguard Service, even though women consist of 23.5 percent of the Lifeguard I workforce.

**D. The Employee Population in General Is Not Affected to the Same Degree.**

Again, as demonstrated by the City's own evidence, male lifeguards are not affected by the refusal to rate woman lifeguards fairly.

**E. The City Cannot Demonstrate a Business Necessity to Constantly Rate Men Higher Then Women in the Subjective EPR Process.**

Once the plaintiffs have met their burden, the employer bears the burden of persuasion as to the business necessity of the employment practice in question. (Segar v. Smith, supra, 738 at p. 1267.) If a facially neutral employment practice operates to exclude members of a protected group, the employer must show legitimate, nondiscriminatory reasons for the employment policy or standard imposed. Otherwise, the practice is prohibited. (Griggs, supra, 401 U.S. at p. 431.) Subjective criteria, such as the EPR rating process, may adversely affect a particular group: "[i]f an employer's undisciplined system of subjective decision making has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discrimination actions should not apply." (Watson, supra, 487 U.S. at pp. 990-991.)

Here, the City cannot meet its burden. There is simply no valid reason to routinely rate men better than women in the EPRs. Nor has the City offered an explanation. There can be no valid business necessity of adhering to employment policies and practices that have consistently selected men for promotion at a vastly higher rate than women for the coveted permanent and more highly compensated positions enjoyed predominantly by men since 1918.

Additionally, it is an unlawful employment practice in California for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (Government Code § 12940(k)). This provision creates a statutory tort action with the usual tort elements (duty of care to plaintiffs, breach of duty, causation and damages). (Trujillo v. North

Co. Transit Dist. (1998) 63 Cal.App.4th 280, 286.)

## III.
## DAMAGES

Plaintiffs seek damages for backpay under both Title VII and the California Government Code. (42 U.S.C. § 2000e-5(g); Gov't Code § 12965.) Backpay awards normally reflect lost wages or salary as well as other benefits lost as a result of the discrimination. (EEOC v. Hacienda Hotel (9th Cir. 1989) 881 F.2d 1504, 1518 ["in awarding backpay under Title VII, the district court is required to attempt to make victims of discrimination whole"].) Although backpay is not an automatic or mandatory remedy, there is a strong presumption in favor of backpay awards to victims of discrimination. (Albermarle Paper Co. v. Moody (1975) 422 U.S. 405, 415.)

In Ms. Snow's case, she also seeks damages for lost compensation as the result of her constructive discharge as the result of specific discriminatory treatment she suffered. (See Satterwhite v. Smith (9th Cir. 1984) 744 F.2d 1380, 1381, fn. 1; Cloud v. Casey (1999) 26 Cal.App.4th 895, 908 [front pay award in denial of promotion case].) During the last two years of Ms. Snow's employment, she was constantly ridiculed and retaliated against after filing an internal City complaint. She was told an employee masturbated and placed semen in her hair conditioner; that another employee had used her loofah shower sponge to clean his anus; told she was too attractive to be taken seriously; had a used tampon removed from the employee restroom garbage and waved about; made the brunt of a "best tits" contest; required (along with other females but not males) to report any restroom break, dubbed a "Code Red" on radio channels ( a reference to a woman's menstruation cycle. Most importantly, over a period of more than one year her complaints were never investigated by the City, despite two formal complaints and the City's asserted "100% response policy." Ms. Snow mitigated her damages by obtaining alternative employment.

Plaintiffs also seek "front pay." In Ms. Snow's case reinstatement is not a realistic alternative. (Pollard v. E.I. du Pont de Nemours & Co. (2001) 532 U.S. 843, 846 [court may

order front pay as substitute for reinstatement to compensate plaintiff for future earnings in cases of hostility between plaintiff and employer or its workers, or because of psychological injuries plaintiff suffered as result of discrimination]; Cassino v. Reichhold Chemicals, Inc. (9th Cir. 1987) 817 F.2d 1338, 1347 [award of damages for future lost pay and benefits in lieu of reinstatement furthers remedial goals of anti-discrimination laws 'by returning the aggrieved party to the economic situation he would have enjoyed but for the defendant's illegal conduct . . . Thus, front pay is an award of future lost earnings to make a victim of discrimination whole"].) In Ms. Darling's case there are no positions open at the sergeant level. (Pollard, 532 U.S. at p. 846 )

Alternatively, plaintiffs seek compensatory damages for "future pecuniary loss." (42 U.S.C. § 1981a [Civil Rights Act of 1991]; Commodore Home Systems, Inc. v. Superior Court (Brown) (1982) 32 Cal.3d 211, 221 [allowing all relief generally available in non-contract actions in civil actions under California Fair Employment and Housing Act].)

Plaintiffs will call economist Vickie M. Wolf, CPA, who has calculated Ms. Snow's economic damages for past and future wage loss to be $583,902 (Exh. 30), and Ms. Darling's economic damages to be $268,664 (Exh. 31).

Finally, both plaintiffs seek emotional distress damages in a reasonable amount to be determined by the court. (42 U.S.C. § 1981a(b)(3) [allowing recovery for 'emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses"].) As both plaintiffs will testify, they have suffered varying degrees of substantial and enduring emotional distress. Ms. Snow is presently being treated by a psychiatrist, Dr. Blumenstein. Ms. Darling has been prescribed medication in the past to help with her emotional distress.

## IV.
## INJUNCTIVE RELIEF

Courts also may order injunctive relief where appropriate. Title VII explicitly authorizes courts to "enjoin the [employer] from engaging in an unlawful employment practice, and order such affirmative action as may be appropriate." (42 U.S.C. § 2000e-5(g); Gov't Code

§ 12970(a) [California FEHA]; Johnson v. Civil Service Comm'n (1984) 153 Cal.App.3d 585, 591.) This authorization gives district courts broad equitable power to fashion remedies to make discrimination victims whole by putting them where they would have been but for the employer's unlawful conduct. (See League of United Latin American Citizens (LULAC), Monterey Chapter 2055 v. City of Salinas Fire Dept. (9th Cir. 1991) 654 F.2d 557, 559 [retroactive promotion appropriate remedy where discrimination was cause of fireman's failure to be promoted and City failed to prove he would not have obtained position even absent discrimination].) Such relief may include requiring the employer to conduct training programs for all employees regarding equal opportunity requirements, the rights and remedies of those who allege discrimination, and the employer's internal grievance procedures. (Gov't Code § 12965(c).)

Upon finding a Title VII or FEHA violation, the court has a "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar discrimination in the future." (Albermarle Paper Co. v. Moody (1975) 422 U.S. 405, 418; see also Donald Schriver, Inc. v. Fair Employment & Housing Comm'n (1986) 220 Cal.App.3d 396, 409-410 [FEHA's express purpose is "to provide effective remedies" to eliminate discriminatory practices].)

## V.
## CONCLUSION

Even after this complaint was filed, the City continued to unfairly treat women in the EPR process. In the face of this litigation, as if to defy the power of this court, the City provided 21 male Lifeguard IIs an outstanding rating, and failed to provide even one to a female. (Exh. 16.) Even Carrie Houlihan, the 2003 Lifeguard of the Year, failed to receive an outstanding EPR like 21 of her male counterparts. (Bender Depo., pp. 34:20-39:21.) All seven employees promoted to Sergeant in 2003 and 2004 were men, five of whom had received an outstanding EPR in at least one of the two years prior to promotion. (Exh. 15.)

In the fall of 2003, even after this complaint was filed, the City provided 33 outstanding ratings to male Lifeguard Is and only three to female Lifeguard Is (an 11 to 1 ratio although the

ratio of male Lifeguard Is to females was only about 3 to 1). (Exh. 16.) In October 2003, all five employees promoted to Lifeguard II were male, and all had outstanding ratings each of the past two years (and all but one had an outstanding three years prior to the promotion). (Exh. 15.) If anything, the City's discrimination of women has only gotten worse since the litigation was commenced.

Plaintiffs respectfully request this court to find in favor of the plaintiffs and discharge its "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." (Albermarle Paper, supra, 422 U.S. at 418.)

Dated: April 12, 2005

**LAW OFFICES OF MICHAEL A. CONGER**

By: *Michael A. Conger*
Michael A. Conger
Attorney for Plaintiffs

ORIGINAL

**MICHAEL A. CONGER, ESQUIRE (State Bar No. 147882)**
**LAW OFFICES OF MICHAEL A. CONGER**
16236 San Dieguito Road, Suite 4-14
**Mailing:** P.O. Box 9374
Rancho Santa Fe, California 92067
Telephone: (858) 759-0200
Facsimile: (858) 759-1906

Attorneys for Plaintiffs ERIN SNOW, LISA DARLING, on behalf of themselves and all others similarly situated

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIN SNOW and LISA DARLING, individuals, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN DIEGO; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO: 03 CV 0527 LAB(BLM)<br><br>DECLARATION OF SERVICE<br><br>Date Served: April 12, 2005<br><br>Persons Served:<br><br>Mark Stiffler, Deputy<br>Office of the City Attorney<br>Civil Division<br>1200 Third Avenue, Suite 1100<br>San Diego, CA 92101 |

I, the undersigned declare under penalty of perjury that I am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action; my business address is 16236 San Dieguito Road, Suite 4-14, P.O. Box 9374, Rancho Santa Fe, California 92067.

On April 12, 2005, I served the foregoing document(s):

**1. PLAINTIFFS' TRIAL BRIEF;**

on the following:

| | |
|---|---|
| **Mark Stiffler, Deputy**<br>**Office of the City Attorney**<br>**Civil Division**<br>**1200 Third Avenue, Suite 1100**<br>**San Diego, CA 92101**<br>**Telephone: (619) 533-5800**<br>**Facsimile: (619) 533-5856** | **Attorneys for Defendant**<br>**City of San Diego** |

___ I then sealed each envelope and, with the postage thereon fully prepaid, deposited each in the United States mail at Rancho Santa Fe, California, on April 12, 2005.

XX I personally delivered such documents by hand to the above-named individual at 1200 Third Avenue, Suite 1100, San Diego, CA on April 12, 2005.

___ I served such documents via facsimile transmission. The transmission was reported as complete and without error on April 12, 2005, at ____ p.m. from the fax machine located at (858) 759-1906. The attached transmission report was properly issued by the facsimile machine.

___ I personally placed the documents in a Federal Express Letter envelope on April 12, 2005, and caused it to be sent via FedEx Priority Overnight service for delivery on ______________, before 10:30 a.m.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on April 12, 2005, at Rancho Santa Fe, California.

Patricia B. Messer